UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| 2 WEST, INC., On Behalf of itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SECURITY CAPITAL ASSURANCE LTD., XL INSURANCE, LTD., PAUL S. GIORDANO, and DAVID P. SHEA, Defendants. | **07 CV 11358**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

DEC 1 8 2007
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff, 2 West, Inc. ("2 West"), on behalf of itself and all others similarly situated, by his undersigned attorneys, alleges upon personal knowledge as to itself and its own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through its attorneys, which included, among other things, a review of public documents and announcements made by the defendants, Securities and Exchange Commission ("SEC") filings, news articles, analysts reports and press releases regarding Security Capital Assurance Ltd. ("Security Capital" or the "Company"), and plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action brought by Plaintiff on behalf of itself and a Class consisting of all other persons and entities who purchased the publicly-traded common stock of Security Capital pursuant to and/or traceable to the Company's June 7, 2007 secondary offering (the "Offering") of 9.68 million shares at $31.00 per share.   In

connection with the Offering, defendants made materially false and misleading statements regarding the Company's business and credit-quality of its insured portfolio. As a result of his purchase of Security Capital's common stock, plaintiff and other members of the class suffered damages.

## JURISDICTION AND VENUE

2.     The claims alleged herein arise under Sections 11, and 15 of the Securities Act.

3.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. §78aa.

4.     Venue is proper in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. §1391(b). Many of the acts and transactions alleged herein occurred in part in this District. XL Capital Assurance Inc. ("XL Capital Assurance"), an operating subsidiary of Security Capital, maintains its corporate headquarters in this District.

5.     In connection with the acts, transactions and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of the national securities exchanges.

## THE PARTIES

6.     Plaintiff, 2 West purchased Security Capital common stock on the Offering as detailed in the attached Certification and has been damaged thereby.

7.     Defendant Security Capital is a Bermuda-domiciled holding company whose operating subsidiaries provide credit enhancement and protection products to the

2

public finance and structured finance markets throughout the United States and internationally. The Company, through its subsidiaries -- XL Capital Assurance and XL Financial Assurance Ltd. ("XL Financial") -- issues financial guarantee insurance policies and credit default swaps, as well as the reinsurance of financial guarantee insurance and credit default products written by other insurers. XL Capital Assurance is an insurance company domiciled in the State of New York and is licensed to conduct financial guarantee insurance business in all fifty states, as well as in the Commonwealth of Puerto Rico, the District of Columbia and the U.S. Virgin Islands.

8.      Security Capital was formed on March 17, 2006 by XL Capital Ltd ("XL Capital"). XL Capital contributed its ownership interests in its financial guarantee insurance and financial guarantee reinsurance operating businesses to Security Capital and sold common shares of the Company in an initial public offering (the "IPO"). The contribution of the businesses from XL Capital to Security Capital occurred on July 1, 2006 and the Company's IPO was consummated on August 4, 2006. As a result of the IPO, XL Capital owned approximately 63% of the outstanding voting common shares.

9.      Defendant XL Insurance Ltd. ("XL Insurance") is a subsidiary of XL Capital and sold 9.68 million shares at $31.00 per share in the Offering. At the time of the Offering, XL Capital controlled three out of nine seats on the Company's Board of Directors (the "Board"). The chairman of the Board was also the chairman of XL Capital's board of directors. After the Offering, XL Capital owned approximately 46% of Security Capital.

10.     Defendant S. Giordano ("Giordano") was, at all relevant times, president, chief executive officer and a member of the Board of Security Capital.

11.     Defendant David P. Shea ("Shea") was, at all relevant times, the chief financial officer of Security Capital.

12.     By reason of their management positions, and/or membership on the Board, and their ability to make public statements in the name of Security Capital, Giordano and Shea (collectively, "the Individual Defendants") were and are controlling persons, and had the power and influence to cause (and did cause) Security Capital to engage in the unlawful conduct complained of herein.

13.     By reason of their positions with the Company, the Individual Defendants had access to internal Company documents, reports and other information, including the adverse non-public information concerning the Company's Offering and business, and attended management and/or Board meetings.   The Individual Defendants were responsible for the truthfulness and accuracy of the Company's public filings and press releases described herein.

14.     Security Capital, and the Individual Defendants as officers and/or directors of a publicly-held company, had a duty to disseminate promptly truthful and accurate information with respect to the Company and to correct promptly any public filings or statements issued by or on behalf of the Company which had become false or misleading.

## SUBSTANTIVE ALLEGATIONS

15.     On April 23, 2007, Security Capital reported its earnings for the three-month period ended March 31, 2007. Net income in the first quarter of 2007 was $37.3 million, or $0.58 per share, versus $16.7 million, or $0.36 per share, in the first quarter of 2006. According to the Company, the increase in net income during the first quarter was largely due to a 47% increase in total revenues, which was driven primarily by growth in

4

net premiums earned and investment income. Net losses and loss adjustment expenses produced a benefit of $0.8 million for the quarter, and the Company's mark-to-market losses on credit derivatives were approximately $6.9 million. In announcing these results, Giordano stated that:

> I am pleased with the solid operating results that we posted this quarter as we continue to build upon the momentum that we developed in 2006. . . . New business production was healthy amid turbulence in certain sectors of the credit market, with opportunities in U.S. structured finance and international business leading the way for us. We are well positioned to take advantage of credit market volatility when it arises, as it did with respect to U.S. sub-prime mortgages this quarter, while maintaining underwriting and pricing discipline.

## The Offering

16. On or about June 7, 2007, XL Insurance sold 9.68 million shares of Security Capital in a secondary offering at $31.00 per share. In connection with the Offering, the Company filed a registration statement and prospectus with the SEC on or about May 25, 2007 (the "Registration Statement/Prospectus"), which incorporated by reference the Company's 2006 Form 10-K ("2006 10-K") and the Form 10-Q for the period ended March 31, 2007 ("First Quarter 2007 10-Q"). The Registration Statement/Prospectus, the 2006 10-K and the First Quarter 2007 10-Q were signed by the Individual Defendants. The entire proceeds if the offering went to XL Insurance and more to the Company.

17. The Registration Statement/Prospectus stated that Security Capital has "a disciplined approach to underwriting that emphasizes risk-adjusted profitability over market share." The Company further touted its "diversified, high-quality portfolio," and assured investors that the weighted average credit rating of the obligations that it guarantees was "A+." The Registration Statement/Prospectus states:

5

We have a diversified, high-quality portfolio, comprised of $48.1 billion, $53.8 billion and $16.3 billion of consolidated net par outstanding (principal amount of guaranteed obligations net of amounts ceded to reinsurers) in the public finance, structured finance and international finance, respectively, as of March 31, 2007. Our reinsurance business gives us access to credit exposures that we may not otherwise have the opportunity to obtain through our primary insurance business. As of March 31, 2007, the weighted average credit rating of the obligations that we guaranty was "A+."

18.    The Registration Statement/Prospectus also discusses the importance of Security Capital's "AAA" rating from the credit-rating agencies, stating that, with respect to financial guarantee insurance, "typically there is either a requirement or strong commercial preference for triple-A-rated insurance policies."    The Registration Statement/Prospectus states:

We are one of six financial guarantors with triple-A ratings from Moody's, S&P and Fitch and the only financial guaranty reinsurer with triple-A ratings from Moody's, S&P and Fitch. In the principal market for financial guaranty insurance, typically there is either a requirement or strong commercial preference for triple-A-rated insurance policies. In the reinsurance market, a triple-A-rated reinsurer provides greater rating agency capital relief to the ceding insurer than a lower-rated reinsurer.

19.    In the 2006 10-K, the Company discusses its underwriting policies. The 2006 10-K stated that:

We have developed underwriting procedures that enable us to conduct our own, independent assessment of risk for each obligation that we guarantee. Exposure limits and underwriting criteria are established, as appropriate, for sectors and asset classes.

Each transaction passing an initial underwriting review, intended to test the desirability of the proposed exposure, is assigned to a team including relevant underwriting and legal personnel. Each transaction is further screened for characteristics that require an accounting review. In such cases, finance personnel review the proposed exposure for compliance with applicable accounting standards and investment guidelines. The underwriting team reviews the structure of the transaction, and the underwriter reviews credit issues pertinent to the particular line of business. In our financial guarantee line, particularly for ABS, CDO and

6

other transactions dependent on structured cash flows for repayment of debt, underwriters generally apply computer-based models to stress test cash flows in their assessment of the risk inherent in a particular transaction.

20.     In the 2006 10-K, the Company also discussed its credit derivatives business, which earned net premiums of $23.7 million in fiscal-year 2006.  The Company's notional exposure, net of reinsurance, from the issuance of credit default swap policies was $24.6 billion at December 31, 2006, which represented 20.8% the Company's total net par outstanding.

21.     Concerning the Company's accounting treatment of its credit-derivatives portfolio, the 2006 10-K states that the Company's net income fluctuates dramatically because of Financial Accounting Standards Board ("FASB") § 133, which requires derivative instruments (such as the Company's credit default swaps) to be marked-to-market quarterly.  The 2006 10-K states that "[u]nrealized gains and losses on credit derivatives and insurance policies that we account for as derivative contracts are a function of changes in the estimated fair value of those contracts. We expect these unrealized gains and losses to fluctuate primarily based on changes in credit spreads and the credit quality of the referenced securities."

22.     The 2006 10-K also discusses the methodology by which the Company determines the "fair value" of its credit default swaps portfolio.  The 2006 10-K states:

> We determine the fair value of our issued in-force credit default swaps using a model we have developed. This model utilizes observable market data where available and is dependent upon a number of factors including changes in interest rates, credit spreads, changes in credit quality, expected recovery rates and other market factors. The change in fair value resulting from movements in these factors is unrealized as the credit default swaps are not traded to realize this value. Because the valuation of our credit default swaps requires management to make certain assumptions and

estimates, actual experience may differ from the estimates reflected in our consolidated financial statements, and the differences may be material.

23.     The 2006 10-K also discusses the Company's credit monitoring, and assures investors that that the Company's credits are closely monitored through its credit surveillance department. The 2006 10-K states that:

> Our surveillance department is responsible for monitoring the performance of our in-force portfolio. They maintain a list of credits that they have determined need to be closely monitored and, for certain of those credits, they undertake remediation activities they determine to be appropriate in order to mitigate the likelihood and/or amount of any loss that we could incur with respect to such credits.
>
> Our surveillance department focuses its review on monitoring the lower rated bond sectors. It tracks performance monthly to try to ensure that covenants have not been breached.

24.     Finally, the 2006 10-K also discusses at length the Company's policies for establishing loss reserves, and informs investors that the Company believes its reserves are adequate. The 2006 10-K states:

> Our financial guarantees insure scheduled payments of principal and interest due on various types of financial obligations against payment default by the issuers of such obligations. We establish reserves for losses and loss adjustment expenses on such business based on our best estimate of the ultimate expected incurred losses. Our estimated ultimate expected incurred losses are comprised of: (i) case basis reserves, (ii) unallocated reserves, and (iii) cumulative paid losses to date.

25.     The statements contained in ¶¶ 18, 20-25 were materially false and misleading, or omitted to state other facts necessary to make the statements made not misleading, because: (1) the Company's portfolio was not diverse and of high-quality because a substantial portion was related to sub-prime residential mortgage backed securities ("RMBS") and collateralized debt obligations ("CDOs") that had declined substantially in value due to higher default rates and foreclosures by homeowners; 2) the

Company's net loss reserves were inadequate in light of the Company's deteriorating credit portfolio, specifically its RMBS and CDO portfolios; 3) the Company's underwriting standards were not prudent or appropriate because the Company's portfolio was concentrated in RMBS, CDOs and home equity lines of credit ("HELOC") that were originated in 2006 and 2007 that had demonstrated higher default rates and credit risks; 4) the Company's credit default swaps were not fairly valued at the time of the Offering because of the dislocation in the credit markets and a widening of credit spreads, and 5) as a result of the Company's imprudent underwriting, inadequate loss reserves and overvaluation of its credit default swaps, the Company's AAA credit rating was at risk of being downgraded.

## The Company Reports a Substantial Decline in the Fair Market Value of its Credit Default Swaps

26.     On July 23, 2007, Security Capital announced earnings for the three month period ended June 30, 2007. Net income was $25.9 million or $0.40 per share compared to $36.4 million or $0.79 per share in the second quarter of 2006. The Company attributed the decline in net income during the quarter to "a decline in refunding activity, an increase in unrealized losses on derivative financial instruments caused by widening credit spreads and the impact of additional shares issued during the Company's initial public offering ("IPO") in August 2006." For the second quarter, net realized and unrealized losses on the Company's credit derivative portfolio were $22.2 million.  Net losses and loss adjustment expenses were $3.0 million in the second quarter of 2007.

27.     On the second quarter conference call, Shea discussed the mark-to-market loss in the Company's credit derivatives portfolio.  He stated that the Company's CDO

portfolio stood at $35.7 billion, and that the Company saw a widening of credits spreads late in the second quarter. Shea stated that $14.4 billion of the unrealized loss was associated with senior AAA high grade structured finance CDOs.

28.     On July 24, 2007, Security Capital's common stock declined from $28.84 to $24.46.

29.     On October 16, 2007, Security Capital announced that its results for the third quarter 2007, ended September 30, 2007, will be affected by an unrealized, pre-tax, mark-to-market loss of approximately $145 million with respect to its credit derivatives portfolio. The Company stated that the mark-to-market loss associated with the credit derivatives portfolio was caused by significantly wider credit spreads in the residential mortgage and corporate credit sectors.

30.     On October 25, 2007, Security Capital reported its third quarter 2007 results. The Company reported a net loss of $89.9 million, or $1.40 per share, compared to net income of $28.4 million or $0.49 per share for the third quarter of 2006. The net loss per share during the quarter was due to a $143.0 million pre-tax ($131.7 million after-tax, or $2.05 per share), unrealized mark-to-market loss on financial guarantee obligations executed in credit derivative form. Operating income, a non-GAAP measure as defined below, for the third quarter of 2007 increased 45% to $46.0 million, or $0.72 per share, compared to 2006 third quarter operating income of $31.8 million, or $0.55 per share. Net losses and loss adjustment expenses were $7.4 million in the third quarter of 2007, compared to $5.0 million in the same quarter of 2006. The increase was due to additions to unallocated reserves associated with the growth of the insured portfolio and an increase in loss adjustment expenses.

    c)      whether plaintiff and the other members of the
Class have suffered damages and, if so, in what
amount;

39.    Plaintiff's claims are typical of the claims of the members of the Class.
Plaintiff and the other members of the Class each sustained damages arising out of the
defendants' wrongful conduct in violation of federal law as complained of herein.

40.    Plaintiff will fairly and adequately protect the interests of the members of
the Class and has retained counsel competent and experienced in class actions and
securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of
the Class.

41.    A class action is superior to other available methods for the fair and
efficient adjudication of the controversy because joinder of all members of the Class is
impracticable. Furthermore, because the damages suffered by the individual Class
members may be relatively small, the expense and burden of individual litigation make it
impossible for the Class members individually to redress the wrongs done to them.
Plaintiff anticipates no unusual difficulties in the management of this action as a class
action.

## NO SAFE HARBOR

42.    The statutory safe harbor provided for forward-looking statements under
certain circumstances does not apply to any of the allegedly false statements pleaded in
this complaint. Many of the specific statements pleaded herein were not identified as
"forward-looking statements" when made. To the extent there were any forward-looking
statements, there were no meaningful cautionary statements identifying important factors
that could cause actual results to differ materially from those in the purportedly forward-

13

looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

**COUNT I**

**VIOLATION OF SECTION 11 OF THE
SECURITIES ACT AGAINST ALL DEFENDANTS**

43. Plaintiff repeats and reiterates each and every allegation contained above, as if fully set forth herein.

44. This claim is brought by plaintiff, on behalf of itself and other members of the Class, who purchased Security Capital's common stock pursuant to the Registration Statement/Prospectus. Each Class member acquired their shares pursuant to the Registration Statement/Prospectus.

45. Defendants are liable under this claim because the Registration Statement/Prospectus contained untrue statements or omitted material facts required to be stated or necessary to make the statements not misleading.

46. Security Capital is the issuer of the stock sold via the Registration Statement/Prospectus. As issuer of the stock, the Company is strictly liable to plaintiff and the Class for the material misstatements and omissions therein.

47. The Individual Defendants, as signatories to the Registration Statement/Prospectus, as directors, and/or officers and controlling persons of the issuer, owed to the holders of the stock obtained through the Registration Statement/Prospectus

14

the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement/Prospectus at the time they become effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading. Defendants failed to exercise reasonable care in connection with issuing the Registration Statement/Prospectus for the Offering. As such, defendants are liable to the Class.

48. None of the defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement/Prospectus were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

49. Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Registration Statement/Prospectus, which misrepresented or failed to disclosed, *inter alia*, the facts set forth above. By reason of the conduct herein alleged, each defendant violated and/or controlled a person who violated §11 of the Securities Act.

50. At the time they obtained their shares of Security Capital, the plaintiff and members of the Class did so without knowledge of the facts concerning the misstatements or omissions alleged herein.

51. This action is brought within one year after discovery of the untrue statements and omissions in and from the Registration Statement/Prospectus should have been made through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement/Prospectus.

52.     By virtue of the foregoing, plaintiff and the other members of the class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from defendants and each of them, jointly and severally.

### COUNT II

### VIOLATION OF SECTION 15 OF THE SECURITIES ACT AGAINST XL INSURANCE AND THE INDIVIDUAL DEFENDANTS

53.     Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1-53, above, as if fully set forth herein.

54.     This count is asserted against XL Insurance and the Individual Defendants and is based upon Section 15 of the Securities Act.

55.     XL Insurance and the Individual Defendants, by virtue of their stock ownership, offices, directorships and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Security Capital. XL Insurance and the Individual Defendants had the power and influence and exercised the same to cause Security Capital to engage in the acts described herein.

56.     By virtue of the misconduct alleged herein, and the primary violation of Section 11 of the Securities Act, XL Insurance and the Individual Defendants are liable are liable as control persons to the plaintiff and the Class for damages.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on his own behalf and on behalf of the Class, prays for judgment as follows:

(a)     Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

16

(b)     Awarding plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

(c)     Awarding plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

(d)     Such other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff demands a trial by Jury.

Dated:  December 14, 2007

By:_____
Richard A. Speirs

**ZWERLING, SCHACHTER &
ZWERLING, LLP**
Richard A. Speirs
41 Madison Avenue
New York, NY 10010
Phone: (212) 223-3900
Facsimile: (212) 371-5969

**ZWERLING, SCHACHTER &
ZWERLING, LLP**
Kevin M. McGee
595 South Federal Highway, Suite 600
Boca Raton, Florida 33428
Phone:  (561) 544-2500
Facsimile:  (561) 544-2501

**Attorneys for Plaintiff**

N:\SECURITY CAPITAL ASSURANCE\Security Capital Cmplt.doc

## CERTIFICATION OF 2 WEST, INC.

2 West, Inc. ("Plaintiff"), declares that:

1.   Plaintiff has reviewed the class-action complaint against Security Capital Assurance Ltd. And has authorized its filing;

2.   Plaintiff did not purchase any security, which is the subject of this action, at the direction of counsel or in order to participate in this private action;

3.   Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary;

4.   Plaintiff's transaction in the security that is the subject of this action during the proposed class period is as follows: purchased 100 shares of common stock at $31.00 per share on June 6, 2007;

5.   During the three years prior to the date of this Certification, Plaintiff has sought to serve or served as a representative party for the following class action filed under the federal securities laws: *In re Lazard Ltd. Sec. Litig.*, 05-cv-5630(VM)(S.D.N.Y.); and

6.   Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

Plaintiff declares under penalty of perjury that the foregoing is true and correct.

December , 2007

2 West, Inc.